DENNIS GRIFFIN,

     Plaintiff,

vs.                                  Case No.: 04-C-00512

ODISE BENNETT and
JONATHAN DELAGRAVE

     Defendants.

## AFFIDAVIT OF MARY E. NELSON

STATE OF WISCONSIN    :
                          :SS
COUNTYOF MILWAUKEE :

MARY E. NELSON, being first duly sworn, deposes and states as follows:

1.     I, Mary E. Nelson, am an attorney duly licensed to practice law in the state of Wisconsin and before this court, and make this affidavit in support of the Defendants' Amended Motion for Summary Judgment. This affidavit is made upon personal knowledge.

2.     Paragraph 1 of the Scheduling Order dictates that on or before November 5, 2004, the plaintiff was to "notify the defendants of any lay witnesses the plaintiff may call at trial." As of today's date, no such notification or identification has been received by the defendants.

3.     A check of the PACER system also reflects that no "notification" or other designation of lay witnesses from the plaintiff is on file with the court.

4.     Paragraph 2 of the Scheduling Order dictates that "On or before November 20, 2004, the plaintiff shall notify the defendants of any expert witnesses the plaintiff may call at trial,

and shall submit with that notice a report…" As of today's date, no such notification or reports have been received by the defendants.

5.     A check of the PACER system also reflects that no such notifications, and no such reports, are on file with the court.

6.     Attached as Exhibit A and incorporated herein by reference are the following excerpts from the deposition of Dennis Griffin taken on February 18, 2005:

a)     page 23, lines 19-25;

b)     page 24, lines 1-10;

c)     page 36, lines 24 & 25;

d)     page 37, lines 1-22;

e)     page 38, lines 3-11;

f)     page 39, lines 6-13;

g)     page 40, lines 7-25;

h)     page 41, lines 1-11;

i)     page 46, lines 12-19;

j)     page 48, lines 5-7

k)     page 51, lines 1-25;

l)     page 52, lines 1-25;

m)    page 53, lines 1-22;

n)     page 63, lines 11-25;

o)     page 64, lines 1-25; and

p)     page 65, lines 1-15.

7.     Attached as Exhibit B and incorporated herein by reference are the following excerpts from the deposition of Jonathan Delagrave taken on January 11, 2005:

   a)     page 14, lines 11-13;

   a)     page 41, lines 13-25; and

   b)     page 42, lines 1-5.

Pursuant to 28 U.S.C. Sec. 1746 I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on July 25, 2005.


 /s/ Mary E. Nelson
Mary E. Nelson

1              UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF WISCONSIN

3  ------------------------------------------------------------

DENNIS GRIFFIN,

4

           Plaintiff,

5

          vs.          Case No. 04-C-00512

6

ODISE BENNETT and

7  JONATHAN DELAGRAVE,

8          Defendants.

9  ------------------------------------------------------------

10

11

12          Deposition of DENNIS GRIFFIN

13         Friday, February 18th, 2005

14              2:26 p.m.

15               at

16     CRIVELLO, CARLSON & MENTKOWSKI, S.C

         710 North Plankinton Avenue

17       Milwaukee, Wisconsin  53203

18     Reported by Tammy R. O'Neal, RPR

19

20

21

22

23

24

25

EXHIBIT

A

1        was it your grandmother?

2   A   Yes.

3   Q   Do you recall what time your grandmother called you?

4   A   It was early in the morning, probably 8, 9, somewhere

5        between there.

6   Q   Were you still sleeping or were you up?

7   A   I was up.  I was up because I remember I was going

8        through some things.  Yeah, I was up.

9   Q   So you called Mr. Bennett back?

10   A   Uh-huh.

11   Q   Correct?

12   A   Yes, ma'am.

13   Q   Who started the conversation in terms of explaining

14        the purpose for the call, was it Mr. Bennett

15        explaining it to you or --

16   A   If you call that an explanation, yeah.

17   Q   Well, I'm trying to figure out who started the

18        conversation.  Was it --

19   A   It was Mr. Bennett.  When I called him, I recall it's

20        like what's going on, Mr. Griffin.  I'm like I don't

21        know what's going on.  And he told me that -- he

22        said, well, you need to get in here to talk to me

23        because your job is on the line.

24   Q   And we're talking the morning of the 22nd?

25   A   Yes.

1    Q    And did he tell you what time he wanted you to come
2         in?
3    A    I don't recall exactly when.  I know he was like you
4         need to get in as soon as possible.  I know that
5         maybe it might have been 10, something like that, 11,
6         whenever.
7    Q    And you understood the reason he was calling you to
8         come in and your job being on the line was because of
9         your refusal to undergo the drug test?
10   A    Yes.
11   Q    Do you recall what time you arrived at the -- and the
12        meeting was at the detention center?
13   A    Yes.
14   Q    Do you recall what time you arrived at the detention
15        center the morning of January 22nd?
16   A    Not exactly.
17   Q    Was it mid-morning, later in the morning, any sense?
18   A    Mid-morning.
19   Q    Prior to Mr. Bennett calling you the morning of
20        January 22nd, had you spoken with anyone about your
21        conversation with Mr. Delagrave?
22   A    No.
23   Q    Prior to going to the detention center on
24        January 22nd, did you -- between the time you got the
25        call or spoke with Mr. Bennett and the time you

1   Q   During the period of time that you were employed by

2       Racine County, coworkers filed grievances?

3   A   Yes.

4   Q   For a lot of different things?

5   A   Yes.

6   Q   And as you sit here today, you're telling me you

7       didn't know you could file a grievance?

8   A   No, not as far as I guess a drug test, no, that's

9       something that's required.

10   Q   Did you even ask the union representative?

11   A   No.

12   Q   You went to the drug or testing facility on the 22nd

13       and underwent or had -- strike that.

14                    What is the next contact you had with

15       anyone from Racine County?

16   A   After I took the drug test?

17   Q   Yes, on the 22nd.

18   A   It would have to be the 27th.

19   Q   Between the 22nd and the 27th, did you speak with

20       anyone regarding the drug test?

21   A   At work, no.

22   Q   The medical review officer called you?

23   A   Yes.

24   Q   When did the medical review officer call you to tell

25       you that the drug test was positive for marijuana?

| 1 | A | I believe it was the 23rd. |
| 2 | Q | 23rd? |
| 3 | A | I know it was the weekend. |
| 4 | Q | 23rd would be a Friday, 24th would be a Saturday? |
| 5 | A | Yes. |
| 6 | Q | Did you ask any questions of the medical review |
| 7 | | officer regarding the positive drug test? |
| 8 | A | No. |
| 9 | Q | Did you question the accuracy of the drug test? |
| 10 | A | No. |
| 11 | Q | Do you recall what time of day the -- you had the |
| 12 | | conversation with the medical review officer? |
| 13 | A | The evening, maybe 4 or 5:00, something like that. |
| 14 | Q | After you received notification from the -- how long |
| 15 | | was that conversation with the medical review |
| 16 | | officer? |
| 17 | A | Not even five minutes. |
| 18 | Q | What do you specifically -- what do you recall the |
| 19 | | medical review officer saying to you during that |
| 20 | | conversation? |
| 21 | A | That the test results came back positive for |
| 22 | | marijuana. |
| 23 | Q | Did he or she say anything else? |
| 24 | A | He said that he didn't know how -- the process or |
| 25 | | whatever, but the detention center should get in |

1      contact with me, let me know what was going to happen

2      and whatever.

3   Q  So you knew that that information would be passed

4      along to representatives at Racine County?

5   A  Yes.

6   Q  And you understood at that time that a positive drug

7      test would mean discipline?

8   A  Yes.

9   Q  And you knew at that time that a positive drug test

10     could mean termination?

11  A  I knew it could mean that, yes.

12  Q  After hanging up with the medical review officer, did

13     you contact anyone at Racine County?

14  A  I mean I did call for Jonathan.  He was out for that

15     weekend or something like that.  I don't think he

16     works the weekend.  I do remember doing that.

17  Q  Why was it that you were calling?

18  A  Excuse me?

19  Q  Why was it you were calling Mr. Delagrave?

20  A  Because he hadn't called me, and the medical officer

21     said he was going to call me, so I figured I'd call

22     him to see what was going to go on.

23  Q  Did you ask for Mr. Bennett?

24  A  No.  Mr. Bennett doesn't work the weekend.

25  Q  So your recollection is you think Mr. Delagrave may

1  have been off that weekend?

2 A  Yes.

3 Q  Do you recall leaving a message for Mr. Delagrave

4  or --

5 A  To call me back.

6 Q  Did you contact Mr. Nelson or any other union

7  representative at that time?

8 A  No.

9 Q  Knowing that you were facing discipline for a

10  positive drug test?

11 A  No.

12 Q  Why was that?  Why didn't you do that?

13 A  There is no answer.

14 Q  As I understand your prior testimony, Mr. Griffin,

15  the next contact you had with Racine County was when

16  Mr. Bennett called you?

17 A  Yes.

18 Q  That would have been the morning of January 27th?

19 A  Yes.

20 Q  Between your conversation with the medical review

21  officer and your telephone conversation with

22  Mr. Bennett on the morning of January 27th, did you

23  talk with anyone about the positive drug test?

24 A  No.

25 Q  Do you recall what time Mr. Bennett called you on

1    January 27th?

2  A   A little after 8:00, 8 or 9.  8 or 9, I know that was

3      really early.

4  Q   Do you recall, were you already up for the day, or

5      were you still in bed?

6  A   I might have been up, I guess, I don't recall.

7  Q   What do you recall Mr. Bennett saying to you during

8      that telephone conversation?

9  A   That I need to come in and see him and that's when he

10     said my job was on the line, I'm sorry.

11 Q   Did he say -- okay, when we talked about the meeting

12     on the 22nd, you had mentioned that during that

13     telephone conversation with Mr. Bennett that he had

14     said you needed to come in because your job was on

15     the line.  Did he say that on the 22nd?

16 A   No.  I remember on the day of my termination he said

17     my job was on the line.  Excuse me, I have my days

18     mixed up.  On the 22nd he did tell me to come in

19     because I just have to do my job.  Didn't say my job

20     was on the line, just this is my job.

21 Q   But when he called you on the 22nd, you knew it had

22     to do with the drug test?

23 A   Yeah.

24 Q   When he called you on the 27th, you knew it had to do

25     with the drug test?

1 A     Yes.

2 Q     And when he -- as you've described it, he said to you

3       your job is on the line, you need to come in, what

4       did you take that to mean?

5 A     That I had to come in and see what they want to do as

6       far as the drug test if they were going to suspend me

7       or fire me or what.

8 Q     But you knew when Mr. Bennett called you the morning

9       of the 27th, that the purpose of you coming in was to

10       talk about the positive drug test?

11 A     Yes.

12 Q     There were three union representatives at that

13       meeting?

14 A     Uh-huh.

15 Q     Correct?

16 A     Correct.

17 Q     Did you call them?

18 A     No.

19 Q     Do you know who called them?

20 A     Mr. Bennett.

21 Q     How do you know that?

22 A     I'm guessing, I'm sorry. I don't know for sure.

23 Q     Do you recall Mr. Bennett saying anything else during

24       that conversation?

25 A     Over the phone?

Deposition of Dennis Griffin, 2/18/2005

| | | |
|---|---|---|
| 1 | A | No.  After he said whatever, after he read it or |
| 2 | | whatever, that's when I believe Marta started talking |
| 3 | | or whatever. |
| 4 | Q | And what do you recall her saying? |
| 5 | A | She was explaining as far as me being escorted out |
| 6 | | and that was part of their policy and procedures, and |
| 7 | | she had explained that I could either -- you know, as |
| 8 | | far as disciplinary action, I could be terminated or |
| 9 | | suspended or whatever.  And it was at that moment |
| 10 | | that she said that I was terminated. |
| 11 | Q | Did she say anything else? |
| 12 | A | After she told me I was terminated, then she asked me |
| 13 | | did I have any questions or anything to say. |
| 14 | Q | And did you? |
| 15 | A | No, I did not. |
| 16 | Q | Why was that? |
| 17 | A | She had just said I was terminated.  There was no |
| 18 | | reason for me to say anything, the decision was |
| 19 | | final. |
| 20 | Q | You got the documentation or you got Exhibit 2 in |
| 21 | | front of you, correct? |
| 22 | A | Yes. |
| 23 | Q | Do you recall -- it starts off by saying on 1/27/04 |
| 24 | | at approximately 8:40 a.m -- does the time sound |
| 25 | | about right? |

1    regarding the positive drug test results.  He replied

2    no.  Do you remember being asked a question about

3    that?

4  A   Yes.

5  Q   Did you challenge the accuracy of the drug test

6    result?

7  A   No.

8  Q   I asked if the physician had called him.  I restated

9    to ask whether the MRO, medical review officer,

10    physician had called him and discussed the results

11    with him.  Do you remember that being asked of you?

12  A   Yes.

13  Q   Dennis replied yes.  That was your answer?

14  A   Yes.

15  Q   I asked if there was anything we needed to know

16    regarding that conversation.  Dennis replied no.  Is

17    that correct?

18  A   Yes.

19  Q   Therefore it was decided that he would be terminated.

20    The union representative asked why it was

21    termination, not some other level of discipline.  Do

22    you remember that question being asked?

23  A   Yes, I do.

24  Q   Do you remember which union representative it was

25    that asked that question?

| | | |
|---|---|---|
| 1 | | a grievance? |
| 2 | A | No. |
| 3 | Q | Did you ever ask the union if you could file a |
| 4 | | grievance? |
| 5 | A | Yes. |
| 6 | Q | When did you do that? |
| 7 | A | Not if I could file a grievance. I asked them what |
| 8 | | could I do or what decision they made, was it the |
| 9 | | right decision or could they really do that. |
| 10 | Q | Who did you talk to? |
| 11 | A | William Willis. |
| 12 | Q | When? |
| 13 | A | After I was terminated. |
| 14 | Q | But when was it, that same day? |
| 15 | A | It had to have been that day or the next day. |
| 16 | Q | Was it -- were you still at the detention center when |
| 17 | | you had the conversation with Mr. Willis? |
| 18 | A | No. |
| 19 | Q | Was it over the phone? |
| 20 | A | Yes. |
| 21 | Q | Who called who? |
| 22 | A | I called him. |
| 23 | Q | What did you ask Mr. Willis? |
| 24 | A | Could I really be terminated, was that -- was there |
| 25 | | anything I could do as far as that, and that's when |

1   he -- because he was really confused himself.  I

2   guess he never been in a situation or whatever, but

3   after reading the book over, whatever, he told me,

4   well, I guess they really could terminate you.  He

5   didn't understand why because I didn't get like

6   suspended or anything.  He didn't understand why they

7   went straight to termination, but he explained to me

8   they could do that.

9   Q   Because of the positive drug test?

10  A   Yes.

11  Q   And that's something that you had never challenged,

12      the accuracy of the test results, fair statement?

13  A   No.

14  Q   That's correct?

15  A   Yes.

16  Q   Meaning my statement is correct, you never challenged

17      the accuracy of the drug test result?

18  A   Yes.

19  Q   And so even with the positive drug test, you were

20      asking Mr. Willis even with that can they still fire

21      me?

22  A   Uh-huh.

23  Q   And I know I'm -- is that pretty much what you said

24      to him?

25  A   It is.

1   Q   And his response to you was that Racine County could

2        terminate you?

3   A   Yes, that that's one of the options.

4   Q   And so did you ask Mr. Willis about -- specifically

5        about filing a grievance challenging the discipline?

6   A   No, because from his understanding I couldn't

7        challenge the termination, it was over.

8   Q   Did you contact Mr. Nelson or contact

9        Ms. Governatori?

10   A   No.

11   Q   Have you had any conversations with Mr. Willis since

12        either the 27th or 28th of January 2004?

13   A   No.

14   Q   Whether it was the same day or the next day, you

15        spoke with Mr. Willis over the phone?

16   A   Yes.

17   Q   And it was in that conversation you asked about

18        whether or not the county could really do that.  Any

19        other conversations with Mr. Willis after that?

20   A   No.

21   Q   Did you contact any other union representatives?

22   A   No.

23            (Exhibit 3 marked for identification.)

24  BY MS. NELSON:

25   Q   Mr. Griffin, this is a document that you had

1    between the 22nd and 27th, is that something that you

2    were expecting you were going to be paid?

3  A  Yes.

4  Q  When were you expecting to have been paid?

5  A  The next pay period.

6  Q  Which would have been sometime --

7  A  Two weeks after.  I don't know the pay period, but I

8    know every two weeks.

9  Q  Sometime early February?

10 A  Yes, I guess.

11 Q  Had you contacted anyone at Racine County regarding

12   that last paycheck?

13 A  After I received it, yes.

14 Q  After you received what?

15 A  My last paycheck.

16 Q  The one that's marked as Exhibit A?

17 A  The one -- this paycheck after this check here.

18 Q  Exhibit A?

19 A  Yes.

20 Q  Who did you contact?

21 A  Jonathan.

22 Q  And what were you calling him about?

23 A  Why my check was short.

24 Q  And what did he say?

25 A  He told me that because of my drug test came back

1    positive, the days I was off I would not be getting

2    paid for that.  To which I couldn't understand why,

3    but then he goes to tell me that's what the policy

4    is.

5    Q    Did you contact a union representative at that time?

6    A    No.

7    Q    Why not?

8    A    I didn't see a reason to.

9    Q    Well, did you believe --

10   A    As a matter of fact, really when they terminated me,

11        I wasn't part of the union.  More so that wouldn't

12        have came to mind to call the union, I was no longer

13        an employee there.

14   Q    Well, you called Mr. Willis about it after you were

15        terminated?

16   A    Yes.

17   Q    To ask him whether or not they could do that?

18   A    Yes.

19   Q    If Mr. Willis told you, no, they couldn't do that,

20        would you have filed a grievance?

21   A    Yes, if he would have said what they did was not what

22        they were supposed to do, yes.

23   Q    So even though you weren't an employee any longer,

24        you understood that you had the right to file a

25        grievance challenging termination if Mr. Willis told

1     you they couldn't do that?

2   A   Yes, if he told me they couldn't do that, yes.

3   Q   By the same token, if you were not getting paid for a

4     period or for days you believed you were entitled to

5     be paid, you could have filed a grievance on that as

6     well?

7   A   Not after speaking to Jonathan, no.

8   Q   Okay.  Well, regardless of what Mr. Delagrave told

9     you, you disagreed with him?

10  A   Yes.

11  Q   But you didn't contact the union?

12  A   No.

13  Q   You didn't contact Mr. Willis to find out if what

14     Mr. Delagrave told you was accurate?

15  A   No.

16         MS. NELSON:  I would just like to take a

17  two-minute brake.

18         (Recess taken.)

19  BY MS. NELSON:

20  Q   At the January 22nd meeting what was your

21     understanding as to why the union representative was

22     present?

23  A   Because he was supposed to be there.

24  Q   On whose interest was he acting?

25  A   Mine.

```
 1              U.S. DISTRICT COURT

 2         EASTERN DISTRICT OF WISCONSIN

 3  ----------------------------------------------------

 4  DENNIS GRIFFIN,

 5              Plaintiff,

 6

 7       -vs-              Case No. 04-C-00512

 8  ODISE BENNETT and JONATHAN DELAGRAVE,

 9              Defendants.

10  ----------------------------------------------------

11

12         Deposition of JONATHAN DELAGRAVE

13         Tuesday, January 11, 2005

14                2:51 p.m.

15                  at

16  Dennis Kornwolf Racine County Service Center Building

17             1717 Taylor Avenue

18              Racine, Wisconsin

19

20

21    Reported by Kara D. Shawhan, RPR, CMR, CRR

22

23

24

25
```

EXHIBIT

B

1      training, and then if they -- if they matched or if

2      some of the criteria or maybe even one of the

3      criterias matched what we had learned in our

4      training, then I would immediately take the John Doe

5      employee for a drug test.

6  Q   Anything else you would do?

7  A   Well, then under the guidelines I'd have to wait for

8      the employee to take the drug test and then drive

9      him back to his house.  And then as soon as we know

10     the results, we'd immediately contact them.

11 Q   What if the employee refused to take the drug test?

12 A   Well, under the guidelines of our policy, a refusal

13     to take the drug test is deemed a failure.

14 Q   So what are the indicators that you have been

15     trained to observe?

16 A   Sure.  Slurring, slurring language, erratic

17     behavior, red eyes, a personality that is not

18     ordinarily -- If you've known the employee, a

19     personality that's not in accord with his usual

20     personality.

21 Q   Anything else?

22 A   Breath.  If his breath smelled like alcohol.

23 Q   What is the difference between directing an employee

24     under your supervision to take an alcohol -- take a

25     drug and alcohol test with cause as opposed to with

1    statement saying that he had read the alcohol and

2    drug testing policy and that he -- it was failure --

3    Failure to take the drug test would be deemed a

4    failure under the Racine County drug and alcohol

5    testing policy.

6  Q   And did you tell him that?

7  A   Yes.

8  Q   And you -- Did you ever tell him anything to the

9    effect, "Look, you have been -- You are a candidate

10   now chosen under the random drug testing policy of

11   the County"?

12 A   No.

13 Q   Clearly you were requesting him -- Mr. Griffin to

14   take the drug test because of either suspicion or

15   cause.   Correct?

16 A   That's correct.

17 Q   And did you tell Mr. Griffin that he was being

18   requested to take the test because of suspicion

19   and/or cause?

20 A   Yes.

21 Q   You told him that.

22 A   I don't know if I specifically worded it like that,

23   but I said, "We have reason to believe that you're

24   under the -- you're under the influence of marijuana

25   at the workplace" or something similar to that.   I

1     don't remember specifically what I said, but I

2     clearly made it -- I clearly made it clear to him

3     that he was going because it was suspected of

4     being -- having -- being under the influence of

5     marijuana in the workplace.

6  Q  And when you met with him on the 22nd, did you have

7     any other knowledge brought to your attention other

8     than the meeting with the juvenile on January 16

9     that he was using drugs?

10  A  Not that I recall.

11  Q  And as you testify here today -- and I want this

12     record to be clear.  Did you ever have any knowledge

13     that he actually used drugs in the workplace?

14  A  No.  Not until that -- Not until my meeting with the

15     juvenile.

16  Q  But even in your meeting with the juvenile --

17  A  Um-hum.

18  Q  Yes?  Did the juvenile ever say anything to you to

19     the effect that Mr. Griffin ever used drugs in the

20     workplace?

21  A  No.

22  Q  So where did you get any knowledge that he ever used

23     drugs in the workplace?

24  A  My knowledge was based on that he had just recently

25     smoked marijuana.